UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| NELSON MUAN, | ) | Case No. 5:13-cv-0331-PSG |
| Plaintiff, | ) ) | **FINDINGS OF FACT AND** |
| v. | ) | **CONCLUSIONS OF LAW** |
| NORA and BENEDICT VITUG, individually | ) ) | |
| and together dba NORBEL'S RCH, | ) | |
| Defendants. | ) ) | |

From February 10-12, 2014, the undersigned presided over a bench trial in this wage and hour case. The parties presented testimony from five witnesses, all of whom painted a fairly consistent picture of life at Norbel's Residential Care Home between 2009-2011. Norbel's was home to seven mentally disabled individuals, all of whom were free to come and go throughout the day. However, because the care home provided "full-services," an employee was required to be at the care home 24 hours a day. Because there were no other employees besides Plaintiff Nelson Muan ("Nelson")[1] and his wife, Divinia Muan ("Divinia"), one of the two of them stayed on the premises for the vast majority of the time in question.

---

[1] The court apologizes for the informality of this and other references that follow, but finds them necessary for clarity.

United States District Court
For the Northern District of California

The parties' fundamental dispute is over the legal ramification of these facts. Norbel's owners, Nora and Benedict Vitug, contend that the Muans "resided" on the property and had agreed to an arrangement under which the Vitugs were only required to pay Nelson for eight hours of work each day.  Nelson, however, contends that he did not reside on premises and did not agree to any such arrangement; he simply worked there without being allowed to leave, and therefore is entitled to payment for every hour he was at Norbel's, including the time during which he was asleep.

## I. FINDINGS OF FACT

The court heard testimony from Nelson, Divinia, Zenaida ("Zennie") Sanchez, Defendant Nora Vitug ("Nora"), and Defendant Benedict Vitug ("Benedict").  Each witness came across as generally credible, a perception reinforced by the fact that the witnesses' testimony was more or less consistent.  As to who did what when and where, the parties were more or less in agreement. They testified to different understandings of legal obligations, but as to daily life at Norbel's, each witnesses' testimony substantiated the others'.  Against this backdrop, the court makes the following specific findings of fact:

- Between January 2009 and June 2011, Nelson was generally required to be at the care home, ready and able to address residents' needs, at the following times: [2]
  o Monday: 7:00 a.m.-3:00 p.m; 9:00 p.m.-11:59 p.m.
  o Tuesday: 12:00 a.m.- 3:00 p.m.;  9:00 p.m.-11:59 p.m.
  o Wednesday: 12:00 a.m.- 3:00 p.m.;  9:00 p.m.-11:59 p.m.
  o Thursday: 12:00 a.m.- 3:00 p.m.;  9:00 p.m.-11:59 p.m.
  o Friday: 12:00 a.m.- 3:00 p.m.;  9:00 p.m.-11:59 p.m.
  o Saturday: 12:00 a.m.- 7:00 a.m.; 5:00 p.m.-9:00 p.m.
  o Sunday: 7:00 a.m.-10:00 a.m.

---

[2] *See* Docket No. 28-10.  While these times contradict somewhat with the testimony put forth at trial, *see* Feb. 10 Transcript at 40:22-41:22; Feb. 12 Transcript at 52:19-20,  because Nelson bears the burden of proof, the court credits the less rigorous of the schedules discussed, as Nelson has failed to carry his burden to establish that the more rigorous schedule governed.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Between June and November 2011, Nelson was generally required to be at the care home, ready and able to address residents' needs, at the following times:[3]
  - Monday: 12:00 a.m.- 2:00 p.m.; 7:00 p.m.- 11:59 p.m.
  - Tuesday: 12:00 a.m.- 7:00 a.m.
  - Wednesday: 7:00 p.m.- 11:59 p.m.
  - Thursday: 12:00 a.m.- 2:00 p.m.; 7:00 p.m.- 11:59 p.m.
  - Friday: 12:00 a.m.- 2:00 p.m.; 7:00 p.m.- 11:59 p.m.
  - Saturday: 12:00 a.m.- 7:00 a.m.; 5:00 p.m.-9:00 p.m.
  - Sunday: 7:00 a.m.-10:00 a.m.

- The schedules above represent the "normal" routine at Norbel's; although there may have been slight variances on given days or weeks, records of these variances are not before the court.

- When on duty at Norbel's, Nelson was responsible for the care and maintenance of seven mentally disabled adults and one large communal house.  His duties included:[4]
  - cooking breakfast for the residents;
  - serving breakfast to the residents;
  - washing the dishes from breakfast;
  - cleaning up the kitchen, including any additional dishes, after breakfast;
  - providing morning medication as required by the residents;
  - washing residents' clothes;
  - washing residents' bed linens;
  - washing residents' towels and bath linens;
  - preparing morning snack each day for the residents;
  - washing the dishes from morning snack;
  - cleaning up the dining area after morning snack;
  - cleaning the bathrooms provided for resident use;
  - taking care of the house's lawn;
  - fixing anything that broke around the house;
  - cooking lunch for the residents;
  - serving lunch to the residents;
  - washing the dishes from lunch;
  - cleaning up the kitchen, including any additional dishes, after lunch;
  - providing afternoon medication as required by the residents;
  - communicating with Nora Vitug about any special instructions for the day;
  - planning social activities for the residents;
  - organizing social activities for the residents;
  - implementing social activities for the residents;
  - preparing afternoon snack for the residents;
  - washing the dishes from afternoon snack;

---

[3] *See* Feb. 10 Transcript at 77:13-78:11; Feb. 11 Transcript 24:1-26:20; Docket No. 28-10; *see also supra* n. 2 (where testimony conflicts with spreadsheet requests, the lower calculation will govern, as Nelson carries the burden on this issue).

[4] *See* Feb. 11 Transcript at 43:2-44:8; Feb. 12 Transcript at 63:21-25; *see also* Docket No. 28-2.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- cleaning up the dining area after afternoon snack;
- providing evening medication as required by the residents;
- conducting "head count" to ensure that all residents have returned home;
- conducting a second or third "head count" if residents were missing;
- calling the Vitugs to notify them of any missing residents;
- responding to ongoing resident needs, resolving disputes between the residents, and cleaning any messes that the residents created; and
- transporting the residents to any medical appointments.

- On weekdays between approximately 4:00 a.m. and 3:00 p.m., Nelson was the only employee on the premises.[5]

- Divinia worked between 3:00 p.m. and 7:00 p.m. every week day, even though those hours were technically Nelson's. During those hours, she was alone on the premises.[6]

- Beginning in 2008, Nelson left the care home to work as a delivery driver for Tropicana Pharmacy at 3:00 p.m. and returned around 7:00 p.m. every week day.[7]

- Between 7:00 p.m. one day and 4:00 a.m. the next day, Nelson and Divinia were both on the premises.[8]

- Between June 2011 and November 2011, Zennie slept at the care home, in the same room as the Muans, on Tuesday and Wednesday nights.[9]

- If a problem of any sort arose in the night, Nelson would be responsible for resolving it.[10]

- Nelson was often required to be on premises to attend to resident needs between the hours of 7:00 p.m. and 7:00 a.m., including during time when he would otherwise have been sleeping.[11]

---

[5] *See* Feb. 10 Transcript at 13: 21-22; 17:23-18:7; 23: 17.

[6] *See id* at 18:5-6.

[7] *See id.* at 44:16-20.

[8] *See* Feb. 12 Transcript at 71:24-72:5.

[9] *See* Feb. 10 Transcript at 79:18-19; Feb. 12 Transcript at 64:1-6.

[10] *See* Feb. 10 Transcript at 24:9-12.

[11] *See* Feb. 10 Transcript at 25:2-10; Feb. 11 Transcript at 27:11-12.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

## II. CONCLUSIONS OF LAW

Having delineated these largely uncontested facts, the court next turns to the applicable law. Nelson brings one federal and five state law causes of action against the Vitugs.  The court emphasizes at the outset that this opinion addresses only those arguments raised by the parties in their trial and post-trial briefing; although there may be other approaches and other arguments to be made, the court is bound by the papers before it. In that spirit, because the federal claim has been most thoroughly briefed by both sides, the court will address its merits first.

### A.  FLSA Claim- Failure to Pay Minimum Wage and Overtime

Nelson's federal claim arises under the Fair Labor Standards Act.[12]  As described above, although Nelson's hours at Norbel's Care Home varied slightly over the years in question, he spent the vast majority of his time there, including nights and weekends, except for four hours each weekday afternoon, when he went to his second job.  Despite these long hours, pursuant to his written contract with the Vitugs, he only recorded eight hours of work each day for five days each week, regardless of how much time that he actually spent working at the care home.

The parties agree that IWC Wage Order Number 5 provides the appropriate regulations in this matter, and furthermore, they agree that because of Nelson's afternoon job at Tropicana and because he spent most of his time at the care home, 29 C.F.R.§ 785.23 is the most applicable regulation to address his hours between 2009 and June 2011. Section 785.23 provides that:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own.  It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

---

[12] 29. U.S.C. §§ 207, 216(b), and 255(a).

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Department of Labor has clarified that even if he maintains a home elsewhere, an employee will be deemed to "reside" on the employer's premises if "(1) the employee is on duty at the group home and is compensated for at least eight hours in each of five consecutive 24-hour periods; and (2) the employee sleeps on the premises for all sleep periods between the beginning and end of this 120-hour period."  Both parties concede that Nelson met each of these criteria, at least until Zennie was hired.[13]

When an employee resides on the employer's premises, the employer may deduct "sleep time" from the time for which an employee is entitled to compensation if three requirements are met.[14]  First, "employees must be provided private quarters in a homelike environment."[15]  Second, "a reasonable agreement must be reached, in advance, regarding compensable time."[16]  Third, this agreement "should normally be in writing to preclude any possible misunderstanding of the terms and conditions of an individual's employment."[17]  Otherwise, the employee is deemed to be on duty, and therefore entitled to compensation, for all periods in which they are "required to be on the employer's premises or otherwise working in service of the employer."[18]  In short then:

1. An employee is entitled to compensation whenever he or she is on duty;
2. An employee is deemed to be "on duty" when he or she is required to be on the employer's premises;[19] *however*
3. If an employee is deemed to reside on the premises at a group care home because
   a. the employee is on duty at the group home and is compensated for at least eight hours in each of five consecutive 24-hour periods; and

---

[13] *See* Docket No. 49 at 4; Docket No. 50 at 3.

[14] 1988 WL 614199 at *3.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id* at *2.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

b.  the employee sleeps on the premises for all sleep periods between the beginning and end of this 120-hour period;

4.  *Then and only then*, an employer may deduct sleep time from the compensable hours *if and only if*

a.  Employee provided private quarters in a homelike environment; and

b.  Reasonable agreement reached in advance to deduct sleep time; and

c.  (Normally) agreement is in writing.

Thus, the first question before the court is whether or not Nelson was "on duty" when he was "on call" at Norbel's.  As mentioned above, even resident employees are deemed to be "on-duty" when "the employee is required to be on the employer's premises."[20]  Nora Vitug acknowledged both that Nelson was "on call" most evenings, and that he was required to be on the premises to be "on call."[21]  This policy is consistent with California regulations, which require that "[i]n facilities providing care and supervision for 15 or fewer clients, there shall be at least one person on call on the premises" between 10:00 p.m. and 7:00 a.m.[22]  The court therefore finds that because Nelson was not free to leave during his "on call" hours, he was "on-duty" for those hours and entitled to compensation.

Generally, then, Nelson would be entitled to payment for every hour he spent on call. However, the parties agree that Nelson "resided" at the care home for purposes of the Wage Order between January 2009 and June 2011.  Because he resided at the care home, the Vitugs may deduct sleep time from the hours Nelson was required to be there if he was provided private quarters in a homelike environment, and they reached a reasonable agreement with Nelson in advance to deduct sleep time.

---

[20] *Id.*

[21] *See* Feb. 12 Transcript at 68:8-14 ( "Q: [D]id Mr. Muan work 24 hours a day for you? A. He doesn't work 24 hours a day, he works only the day that it's from 7:00 a.m. to 7:00 p.m. Q. So prior to Mr. Muan working at Tropicana, did he provide 24 hours of coverage for you? A. During the day time and at nighttime on call."); 52:19-20 (*"Q: He had to be on the premises to be on call? A: Yeah."*) (emphasis added).

[22] Cal. Code Regs. tit. 22, § 85065.6

7

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Here, the only agreement that the Vitugs have been able to point to is their written contract with Nelson from 2006.[23]  The contract provides the following information about time outside the standard shift: "From 7:00 p.m. to 7:00 a.m. (next day)- EMPLOYEE MAY BE ON CALL.  For ON CALL BASIS, the employer will notify you in case you will be called to work and will be compensated at the rate of 1.5 the regular hourly pay. Work after completing one's regular 8 hour shift will be paid one and one-half time."[24]  Nothing on the face of the agreement addresses any deduction of time for sleep, and Nora Vitug conceded on the stand that nothing in this agreement addresses sleep time.[25]  Furthermore, Nora Vitug testified that the written contract is the only employment agreement between Norbel's and Nelson,[26] precluding any argument that some other contract agreed to in advance governed the issue of sleep time.  The court therefore concludes that because no agreement, reasonable or otherwise, was reached in advance, the Vitugs were not entitled to deduct sleep time from Nelson's wages.

Notwithstanding the above, the Vitugs offer two arguments as to why they should not have to pay Nelson wages for the entirety of his "on call" hours.  First, they argue their policy was only to pay employees for "on call" time spent actively responding to "emergencies."[27]  If that is the Vitugs' policy, then their policy is inconsistent with the law.[28] That argument therefore fails as a

---

[23] *See* Docket No. 28-1.

[24] *Id.* at 3.

[25] Feb. 12 Transcript at 39:6-10 ("Q: Can you tell me if there's any information in this agreement as to how sleep would be dealt with? A. Hymn. Q. Just a yes or no ma'am? A. I don't see it in here.")

[26] *Id.* at 39:3-4 ("Q: Is this the only employment agreement you've ever entered into with Mr. Muan? A. Yes.").

[27] *See* Feb. 12 Transcript at 42:17-20 ("Q: But your policy was that you would be compensated when you attended to on call situations that were emergencies only? A. Correct.").

[28] Defendants cite to *Isner v. Falkenberg/Gilliam & Associates, Inc.*, 160 Cal.App.4th 1393 (2008) in support of the proposition that they are only required to pay for the time that Nelson spent in active labor, not time that he simply spent waiting for something to happen.  However, in *Isner*, "prior to beginning their employment, [the employees] signed a 'resident employee employment agreement,'" which set out specific provisions for time to be paid and not paid when on call,

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

matter of law.  Second, they argue that because Nelson could have asked for a reliever at any time but chose not to, they are not required to pay him for his time.[29]  Both the FLSA and basic employment law principles, however, provide that an employer must compensate for time that an employee is "suffered" to work in addition to the time that he or she is required to work.[30]  Under that standard, even if Nelson "opted in" to on-call time when he could have "opted out," the Vitugs permitted him to do so, reaping the benefits of his labor, and are therefore required to pay him for his time.[31]

        Because Nelson was not permitted to leave Norbel's care home during his "on call" hours, and because he did not reach an agreement with the Vitugs in advance to deduct sleep time, Nelson is entitled to full payment for all of the hours he spent "on call" at Norbel's.  As described above, the court finds that Nelson was required to be at the care home 97 hours per week before Zennie was hired, and 83 hours per week after Zennie was hired.[32]  According to the methodology

---

including a provision to deduct sleep time. *Id* at *1395-96. As described above, no such agreement was present here, so the Vitugs were not entitled to unilaterally decline to pay for time when Nelson was not permitted to leave their facility.

[29] *See id* at 24:17-21; 73:11-18.

[30] 29 U.S.C.A. § 203 ("'Employ' includes to suffer or permit to work."); *Lindow v. United States*, 738 F.2d 1057, 1061 (9th Cir. 1984) ("As long as the work is 'suffered' or 'permitted' outside of normal hours, the work is compensable.").

[31] In their trial brief, the Vitugs make a general assertion that "the Department of Labor found that many of the hours claimed to have been worked by Plaintiff had instead been worked by Divinia," such that if they are "now required to compensate Plaintiff for those same hours, then they should get a refund from Divinia."  Docket No. 41 at 6.  However, this assertion is not supported by any evidence.  Though the brief cites to "Exhibit 12, 7/20/2012 Department of Labor Summary of Unpaid Wages," the brief did not include an "Exhibit 12," nor is there any document labeled "Exhibit 12" anywhere on the docket.  "Exhibit 12" of the joint trial exhibits is the calendar for December 2009 prepared by Nelson in an attempt to calculate his own lost wages, and therefore provides no additional insight.  In the absence of any evidence as to whether or not Divinia may have been paid to be on call during the hours in question, the court declines to require a "refund" from Divinia or to reduce Nelson's recovery by some unknown amount.

[32] *See supra* at 2-3.  The court acknowledges that these are rough numbers based on generalities, rather than precise accounts of each day's work.  However, the Supreme Court has long held that when faced with inadequate record-keeping, it is not appropriate to "penalize the employee by denying him any recover on the ground that he is unable to prove the precise extent of uncompensated work" because this would "place a premium on an employer's failure to keep

9

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

spreadsheet submitted by Nelson, he is owed wages for 121 weeks before Zennie was hired and 23 weeks after she was hired.[33]  All parties acknowledge that he has already been paid for 40 of those hours each week at his regular rate of eight dollars per hour.  That leaves 57 unpaid hours per "pre-Zennie" week and 43 unpaid hours per "post-Zennie" week.  At the rate of $12 per hour,[34] this amounts to $94,632 in unpaid wages.[35]  However, Nelson only asks for $89,957.76 in unpaid wages.  Although the calculations undergirding this number appear to be erroneous, the court cannot justify awarding an amount greater than Nelson's actual request.  He shall therefore recover only $89,957.76 in unpaid wages.  Nelson is also entitled to prejudgment interest on these unpaid

proper records" and "allow the employer to keep the benefits of an employee's labors without paying due compensation." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1945). Because the finds that Nelson has proved that he was in fact required to remain at Norbel's care home during these hours "as a matter of just and reasonable inference," the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn from the employee's evidence." *Id.* Here, the Vitugs' do not dispute that this was the general schedule during which Nelson was required to be at the care home. Because the Vitugs have not provided "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference drawn from the employee's evidence," the court is empowered to award damages "even though the result be only approximate." *Id.*

[33] *See* Docket No. 28-10.

[34] *See* Docket No. 1 at 4 ("Defendants were required by the Fair Labor Standards Act to pay Plaintiff . . . at his overtime rate of one-and-a-half (1.5) times his regular rate for all hours over 40 in a week.").

[35] The court recognizes that this is greater than the amount requested by Nelson.  However, the spreadsheet containing and describing his methodology for his total request is unreliable; basic addition indicates that it is full of errors. *See* Docket No. 28-10. The court therefore conducted its own calculation.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

wages, accruing from the date they were payable at the rate of 10 percent per annum,[36] totaling $19,412.57.[37]

## B. Meal And Rest Break Premiums

Almost as an afterthought, Nelson claims that he is entitled to $13,240 in "premiums" for the Vitugs' failure to provide meal and rest breaks in conformance with California law.  In general, an employer must provide a 10-minute paid rest break for every 4-hours worked and a 30-minute meal period after no more than five hours of work.[38]  An employer satisfies its obligation to provide rest and meal breaks "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted . . . break, and does not impede or discourage them from doing so."[39]  Because the meal and rest breaks are subject to different regulations, the court addresses each type of break independently.

### 1. Nelson Was Inappropriately Denied Meal Breaks In Violation Of California Law and Is Entitled To Premium Pay To Compensate For Those Breaks

Nelson acknowledges in his briefing that "there is a care worker exception" to the general requirement to provide meal breaks for employees who are in "sole charge of the resident(s)" in a group home for the mentally disabled and, "on the day shift, the employer provides a meal at no charge to the employee."[40]  However, when seeking to defeat a meal break claim, "[t]he defendant

---

[36] *See* Cal. Lab. Code § 1194 ("Any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, ***including interest thereon.***") (emphasis added); Cal. Lab. Code § 218.6 ("In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable"); Cal. Civ. Code § 3289 ("[T]the obligation shall bear interest at a rate of 10 percent per annum after a breach").

[37] *See* Docket No. 28-10 at 4.

[38] *See* Cal. Code Regs. tit. 8, § 11050.

[39] *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012).

[40] Docket No. 49 at 9.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   bears the burden of proving that the employee is [subject to an exemption]."[41]   Here, the Vitugs

2   have offered no evidence whatsoever that they provided Nelson with meals free of charge when he

3   was on duty. Given their emphasis at trial on the fact that Nelson got a free place to sleep and the

4   fact that they charged him extra for utilities and rent space when he had visitors over, it seems

5   unlikely that they would provide meals and not point them out. Because the Vitugs have failed to

6   acknowledge, let alone meet, their burden, the court does not have the necessary evidence before it

7   to find that Nelson was fell within the purview of the "care worker" exception to the meal and rest

8   break requirements.  It therefore analyzes the meal break claim under the standard set of

9   regulations.

10

11          In its most recent word on the subject, the California Supreme Court held that "[u]nless the

12   employee is relieved of all duty during a 30 minute meal period, the meal period shall be

13   considered an 'on duty' meal period and counted as time worked."[42]   Although the Court held that

14   an employer does not have an affirmative obligation to ensure that an employee does not perform

15   work during his break time, the Court also held that:

16

17          [w]hen someone is suffered or permitted to work for five hours, an employer is put to a
            choice: it must (1) afford an off duty meal period; (2) consent to a mutually agreed-upon
18          waiver if one hour or less will end the shift; or (3) obtain written agreement to an on-duty
            meal period if circumstances permit. Failure to do one of these will render the employer
19          liable for premium pay.[43]

20   The last of these options, an on-duty meal period, is only permissible when two conditions are met:

21   1) "the nature of the work prevents an employee from being relieved of all duty," and 2) there is

22   "written agreement between the parties [that] an on-the-job paid meal period is agreed to."[44]

23

---

24   [41] *Mondragon v. Fernandez*, Case No. 5:08-cv-05722 RMW, 2012 WL 2590185 (N.D. Cal. July 3,
     2012) (citing R*amirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 802 (Cal.1999)).

25

26   [42] *Brinker*, 53 Cal. 4th at 1040.

27   [43] *Id*. at 1039-40.

28   [44] Cal. Code Regs. tit. 8, § 11050.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The unrebutted testimony established that Nelson was the only employee at Nelson's care home for seven hours every week day from 2009 to June, 2011 and for seven hours every Monday, Thursday, and Friday from June to November, 2011.  This was a sufficient time period to trigger the meal period obligation.  As the only employee present at a full time care facility, it is not possible that he could have been relieved of *"all* duty" such that he was not at the beck and call of the residents or subject to the control of his employer for an uninterrupted break.  Indeed, the Vitugs and Nelson both testified that Nora Vitug would commonly call around the lunch hour with instructions.  Under these circumstances, it is perfectly conceivable that "the nature of the work [would have prevented] an employee from being relieved of all duty," but there is no evidence of a written agreement between the parties indicating that the employee consented to an on-the-job meal period.  This may have been because the Vitugs believed that they were covered by the care worker exception to the meal period requirement, but without evidence of a meal provided free of charge or a written agreement consenting to on-the-job meals, the court is forced to conclude that Nelson is entitled to premium wages for non-compliant meal periods between 2009-2011 in the amount of $3,369.60.

> ### 2.   It Was Permissible For The Vitugs To Require Nelson To Stay In General Supervision Of The Care Home During His Rest Periods

Although Nelson addresses the rest and meal periods together in his brief, the care worker exception imposes less stringent requirements on employers for rest periods than for meal periods. With respect to the 10-minute rest periods, "employees of 24 hour residential care facilities for . . . developmentally disabled individuals may, without penalty, require an employee to remain on the premises and maintain general supervision of residents during rest periods if the employee is in sole charge of residents," so long as the employee may take another rest period if he is "affirmatively required to interrupt his/her break to respond to the needs of residents."[45]  Here, the

---

[45] Cal. Code Regs. tit. 8, § 11050.

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1   Vitugs did put forth evidence that they allowed Nelson to take 10-minute (and longer) breaks, so

2   long as he kept a general ear out for trouble at the house.  The written contract, for example,

3   provides for several break periods in the standard schedule, and Zennie testified that she found time

4   to sit for a rest during her shifts.[46]  This evidence, which the court finds persuasive, is sufficient to

5   demonstrate that Nelson fell within the care worker exemption for the 10-minute rest periods.  The

6   Vitugs are therefore not required to pay any back wages or subject to any penalty fees for requiring

7   him to remain in charge of the premises during his breaks.

8   ### C.  Unfair Competition Law Claims

9       Although Nelson's complaint brings a claim for damages under California's Unfair

10  Competition Law,[47] neither his trial nor his closing briefs put forth any argument for that claim or

11  point to any evidence in support of it.  In fact, the UCL damages do not even appear in Nelson's

12  calculations in his closing brief.  On these grounds, the court finds that Nelson has failed to carry

13  his burden of proof as to this claim.

14  ### D.  Waiting Time Penalties And Liquidated Damages

15      Nelson seeks a variety of punitive damage provisions from the Vitugs.

16      #### 1.  Nelson Is Not Entitled To Statutory Penalties For The Vitugs' Inadvertent
17          Failure To Comply With Wage Requirements

18      Under the FLSA, an employer who fails to pay the proper minimum wage or overtime owes

19  those wages to the employee "and an additional, equal amount as liquidated damages."[48]  In the

20  Ninth Circuit, to avoid liquidated damages, "a FLSA-liable employer bears the 'difficult' burden of

21  proving both subjective good faith and objective reasonableness, 'with double damages being the

---

[46] *See* Feb. 10 Transcript at 75:10-13.

[47] Cal. Bus. & Prof. Code § 17200.

[48] 29 U.S.C. § 216(b).

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

norm and single damages the exception.'" [49]  "A violation of the FLSA is willful if the employer

knew or showed reckless disregard for the matter of whether its conduct was prohibited by the

[FLSA]." [50]  "Where the employer 'fails to carry [his] burden,' we have noted, 'liquidated damages

are mandatory.'" [51]  In addition, willful violations subject an employer to a 3-year statute of

limitations vs. 2-year statute for non-willful violations. [52]

         The Vitugs testified under oath that they believed that they were not required to pay Nelson

for time spent at the care home in the evenings when he was not actively working on handling an

emergency, [53] and that they came to this understanding based on directions from the community

care licensing board. [54]  They also testified that they paid Nelson for the overtime hours that he

reported. [55] As described above, the court finds this sworn testimony credible and finds that the

Vitugs have satisfied their burden of demonstrating good faith efforts to comply with the wage

laws, even if they were unsuccessful in doing so.  Therefore, Nelson is not entitled to recover

liquidated damages from the Vitugs.

---

[49] *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005) (citations omitted).

[50] *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

[51] *See Alvarez,* 339 F.3d at 910.

[52] 29 U.S.C. § 255(a).

[53] S*ee* Feb. 12 Transcript at 43:9-11.

[54] *See id* at 37:25-38:2 ("Q. Did the community care licensing require that you compensate the on call people for their on call time? A. Yes. If they are -- did something, but we don't pay staff during sleeping time.").

[55] *See id.* at 42:20- 43:2; 43: 17-20.

15

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 2.   Nelson Is Not Entitled Additional Penalties For The Vitugs' Failure To Provide Accurate Wage Statements

Lastly, Nelson claims that he is entitled to $4,000 in additional statutory penalties under California Labor Code Section 226(e)(1) for the Vitugs' failure to provide him with accurate wage statements, as required Section 226(a).  The relevant provision reads as follows:

> An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages *or* fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.[56]

This section allows the employee to recover either his actual damages or statutory penalties.  As described above, through this law suit, Nelson has recovered tens of thousands of dollars  in lost wages, his actual harm from the Vitugs' failure to provide him with detailed and accurate wage stubs.  In fact, there is an argument to be made that because he received the benefit of the doubt regarding the number of hours worked, he may have recovered slightly more than he would have been entitled to with accurate wage slips.  Because this recovery is much greater than $4,000, Nelson is entitled to that amount in lieu of unpaid wages, but he may not recover both.

## III. JUDGMENT

The court finds that Nelson Muan is the prevailing party on the federal and state causes of action for Failure to Pay Minimum Wage and Overtime, Failure to Provide Accurate Wage Stubs, and, in-part, Failure to Provide Rest and Meal breaks.  For these claims, judgment is entered for Plaintiff in the amount of $112,739.93 plus attorney's fees.[57]  The clerk shall close the file.

---

[56] Cal. Lab. Code § 226(e)(1) (emphasis added).

[57] *See* 29 U.S.C.A. § 21 ("The court in such action [for recovery of unpaid wages] shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); Cal. Lab. Code § 1194 ("Any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action . . . reasonable attorney's fees, and costs of suit.").

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

**United States District Court**
For the Northern District of California

1

**IT IS SO ORDERED.**

2

Dated: April 11, 2014

3

4                                                    PAUL S. GREWAL
                                                     United States Magistrate Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:13-cv-0331-PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW